NIKE INC., Plaintiff,

v.

VARIETY WHOLESALERS, INC. d/b/a
Rose's Stores, Inc., Defendant.

No. CV 402–182.

United States District Court,
S.D. Georgia,
Savannah Division.

July 22, 2003.

Patrick T. O'Connor, Paul Hughes Threlkeld, Oliver, Maner & Gray, LLP, Savannah, GA, Louis S. Ederer, Neil S. Goldstein, Michael D. Pantalony, Gursky & Ederer, LLP, New York, NY, for Nike, Inc., plaintiff.

Glen M. Darbyshire, Roy Robinson Kelly, IV, Inglesby, Falligant, Horne, Courington & Chisholm, PC, Savannah, GA, W. Thad Adams, III, Matthew J. Ladenheim, Adams, Schwartz & Evans, PA, Charlotte, NC, for Varsity Wholesalers, Inc. dba Rose's Stores, Inc., defendant.

### ORDER

NANGLE, District Judge.

Plaintiff Nike Inc. ("Nike") alleges that defendant Variety Wholesalers, Inc. ("Va-

riety") breached a settlement agreement between the parties and engaged in trademark counterfeiting, trademark infringement, unfair competition, trademark dilution and false designation of origin. Specifically, Nike claims that Variety breached a settlement agreement and violated Nike's trademarks when it sold counterfeit Nike socks, t-shirts and fleece items bearing designs similar to Nike's trademarks. On June 30 through July 2, 2003, the Court tried the case without a jury. The Court now makes the following rulings.

## RULINGS ON PRE–TRIAL MOTIONS

At the end of the discovery period, both Nike and Variety moved for partial summary judgment on the issue of willful blindness (Docs.60, 65). The Court hereby DENIES such motions (Docs.60, 65) on the grounds that a determination on the question of willfulness is not appropriate on a motion for summary judgment. *See Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir.1991) (reversing district court's grant of summary judgment on issue of intent and stating, "As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial.").

The Court DENIES as MOOT Nike's motion for the assignment of a trial date (Doc. 98).

The Court DENIES Nike's motion in limine (Doc. 92) in its entirety. In its motion, Nike moved to: preclude Variety from contesting the authenticity of certain purported Nike garments bought by Variety; preclude Variety from contesting Nike's calculation of Variety's income from the sale of certain purported Nike t-shirts; preclude Variety from offering evidence of its overhead costs; impose sanctions on Variety; and permit Nike to enter Variety's premises and obtain documents relevant to the calculation of Variety's income.

The Court DENIES Variety's motion in limine (Doc. 83) in its entirety. In its motion, Variety moved to: exclude the testimony of David Simpson, Nike's director of security; exclude the testimony of any witness other than David Simpson; exclude the accused garments; exclude third party Fifth Amendment pleas [1]; and exclude materials not previously disclosed as responsive to discovery requests.

## TRIAL ORDER

Based upon the evidence submitted at trial, as well as the post-trial submissions of the parties, the Court makes the following findings of fact and conclusions of law.

---

1. *See Pyles v. Johnson*, 136 F.3d 986, 997 (5th Cir.1998) (Fifth Amendment does not forbid adverse inferences against third party witnesses in a civil action when such witnesses refuse to testify in response to probative evidence offered against them); *LiButti v. United States*, 107 F.3d 110, 120 (2d Cir.1997) (same); *Davis v. Mut. Life Ins. Co. N.Y.*, 6 F.3d 367, 384–85 (6th Cir.1993)(in a civil case, a non-party witness's invocation of the Fifth Amendment gives rise to a legitimate inference that the witness was engaged in criminal activity); *RAD Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 275 (3d Cir. 1986) (allowing the trier of fact in civil case to consider evidence of a non-party's refusal to testify); *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 521–22 (8th Cir.1984) (under certain circumstances, a party to a civil case may call a witness to the stand even when that witness has made known an intention to invoke the Fifth Amendment). In any event, the Court notes that its determination that the Accused Goods are counterfeit is based not on any inference from the Fifth Amendment pleas of non-party witnesses, but rather on the live trial testimony of David Simpson and Stephen Kirkman. The Court thus allows into evidence, but does not rely on, the Fifth Amendment testimony of non-parties to this case.

## I. Findings of Fact

### A. The Parties and the Trademarks

1. Nike is an Oregon corporation with its principal place of business in Beaverton, Oregon.

2. Nike is engaged in the manufacture, distribution and sale in interstate commerce of high quality apparel and other merchandise, including sportswear and sporting goods for men, women and children.

3. Nike is the holder of several registered trademarks including NIKE, NIKE/SWOOSH DESIGN, SWOOSH DESIGN, SWOOSH AIR DESIGN, and NIKE/SWOOSH/AIR DESIGN (collectively, the "Nike trademarks").

4. The Nike trademarks are well known to the consuming public and trade as identifying and distinguishing Nike exclusively and uniquely as the source of high quality products to which such trademarks are applied.

5. The Nike trademarks are famous as trademarks for apparel and sporting goods in the United States.

6. The Nike trademarks have, at all times, been owned exclusively by Nike or its predecessor.

7. The Nike trademarks are the subject of the following registrations in the United States Patent and Trademark Office:

a. Reg. No. 1,277,066 for NIKE, issued on May 8, 1984;

b. Reg. No. 1,945,654 for NIKE, issued on January 2, 1996;

c. Reg. No. 1,237,469 for NIKE/SWOOSH DESIGN, issued on May 10, 1983;

d. Reg. No. 1,284,385 for SWOOSH DESIGN, issued on July 3, 1984;

e. Reg. No. 2,068,075 for SWOOSH AIR DESIGN, issued on June 3, 1997;

f. Reg. No. 2,203,050 for SWOOSH AIR DESIGN, issued on November 10, 1998; and

g. Reg. No. 1,571,066 for NIKE/SWOOSH/AIR DESIGN, issued on December 12, 1989.

8. Each of the Nike trademarks is valid and subsisting and is in full force and effect.

9. The Nike trademarks listed in subparagraphs 7(a) through (e) have achieved incontestable status pursuant to 15 U.S.C. § 1065.

10. Variety is a North Carolina corporation with its principal place of name-brand owner or licensed manufacturer, and on the "secondary market," i.e., from other sources.

### B. The Hilfiger Action, the Polo Action and the Prior Action

17. On August 18, 1997, Variety commenced a civil action against Tommy Hilfiger Licensing, Inc. ("Hilfiger") in this Court (Moore, J.) seeking a declaratory judgment that certain purported Tommy Hilfiger garments sold by Variety were not counterfeit (the "Hilfiger Action").

18. Variety had purchased the garments at issue in the Hilfiger Action on the secondary market.

19. On or about December 1998, Hilfiger and Variety entered into a settlement agreement resolving the Hilfiger Action.

20. G. Templeton Blackburn II, Esq. ("Blackburn"), Variety's vice president and general counsel, was directly involved in the settlement of the Hilfiger Action. Pursuant to

the settlement agreement, Variety agreed to stop selling goods bearing counterfeits of the Hilfiger trademarks, stop manufacturing or offering for sale items with a Bahama Bay Logo which Hilfiger alleged infringed upon Hilfiger trademarks, and modify the Bahama Bay Logo on other items which had already been manufactured. Variety further agreed to pay Hilfiger $975,000.

21. On June 10, 1998, PRL USA Holdings, Inc. ("Polo") commenced a civil action against Variety in this Court (Edenfield, J.) asserting claims of trademark counterfeiting, trademark infringement, unfair competition and trademark dilution arising out of Variety's sale of apparel bearing counterfeits of Polo's registered trademarks (the "Polo Action").

22. On January 12, 1999, Polo and Variety entered into a settlement agreement resolving the Polo Action.

23. Blackburn was directly involved in the settlement of the Polo Action. In the settlement agreement, Variety agreed to stop selling goods bearing counterfeits of the Polo Trademarks and to pay Polo $50,000.

24. On or about September 16, 1999, Randall Rabenold, a private investigator hired by Nike ("Rabenold") contacted Blackburn. Rabenold informed Blackburn that he had purchased a t-shirt at a Rose's Store which bore a purported Nike trademark which Rabenold believed to be counterfeit (the "Rabenold t-shirt"). Blackburn requested that Nike provide written reasons as to why the Rabenold t-shirt was counterfeit.

25. On or about October 6, 1999, David W. Simpson, Nike's director of security ("Simpson") signed and provided to Blackburn an affidavit indicating that the Rabenold t-shirt was counterfeit because it had an incomplete Nike label and had no Nike hang tag.

26. Simpson has been Nike's director of security for approximately ten years. He deals in all aspects of counterfeit goods for Nike. He works with in-house counsel, outside counsel and outside investigators with respect to counterfeit investigations.

27. In many cases, Simpson can determine whether a garment is counterfeit by examining its neck label or hang tag. When inspection of a neck label or hang tag does not conclusively determine a garment's authenticity, Simpson consults with members of Nike's production department or product identification group. Simpson's determination that a garment is counterfeit, however, is his own, based on his own knowledge, from his experience or his review of Nike business records and materials.

28. On or about October 18, 1999, Blackburn had a telephone conversation with Simpson about the Rabenold t-shirt. In this conversation, Blackburn asked Simpson how to identify authentic Nike goods as opposed to counterfeit goods. Simpson responded that Nike did not sell authentic Nike goods that did not have intact hang tags and neck labels. Simpson also informed Blackburn that Variety should watch out for Nike invoices that were being redacted by counterfeiters and reproduced and furnished with goods that were not authentic.

29. On October 18, 1999, Simpson faxed Blackburn a letter confirming that "Nike, Inc. does not sell T-shirts in which the brand label has been removed," and that "[a]ll Nike T-shirts sold in the retail arena will have a complete Nike label in the shirt." Simpson's letter also stated, "If I am able to be of further assistance please do not hesitate to contact me at [telephone number]."

30. Following Blackburn's exchange with Simpson, Variety did not purchase Nike t-shirts in the secondary market unless such t-shirts had both complete hang tags and neck labels.

31. By letter dated October 25, 1999, Blackburn advised Rabenold that Variety was withdrawing from sale the Rabenold t-shirt.

32. By letter dated January 18, 2000, Blackburn wrote to Simpson enclosing a copy of a redacted Nike invoice and advising that Variety was considering the purchase on the secondary market "of a quantity of the enclosed item which bears both the hang tags and interior labels and otherwise appears to us in all respects to be genuine Nike goods." The enclosed redacted invoice indicated that Nike had sold the referenced goods to Nzania, Inc., an authorized distributor of genuine Nike closeout goods.

33. Nike did not respond to Blackburn's January 18, 2000 letter.

34. After receiving Blackburn's January 18, 2000 letter, Simpson gave the garment that Blackburn had enclosed to Nike's outside counsel, Gursky & Ederer P.C.

35. Nike cooperates with other apparel sellers and manufacturers on issues regarding trademarks and counterfeiting. The factors influencing Nike's decision to pursue a particular case are not set out in a book, a memorandum, or other written guidelines. Nike, however, considers the volume of the goods and the ability to locate their source or location. Nike has general guidelines regarding a particular volume of goods that would trigger an investigation or other action. The volume would have to be substantial to cause Nike to spend the money and effort to pursue an investigation. Depending on the garment involved, Simpson might consider 150 garments to be substantial.

36. Nike generally tries to keep confidential the manner in which it determines whether goods are counterfeit or genuine, because it does not want counterfeiters to know the mistakes that they are making.

37. On November 29, 2000, Nike sued Variety in this Court for trademark counterfeiting, trademark infringement, unfair competition, trademark dilution and unfair trade practices (the "Prior Action"). Nike's complaint in the Prior Action alleged that Variety was offering for sale and selling various t-shirts and socks that bore counterfeits of Nike trademarks, and polo-style shirts and short sets bearing the marks "NK Air" and "N Air," which Nike alleged infringed the Nike trademarks.

38. The complaint in the Prior Action concerned apparel which Nike alleged bore unauthorized reproductions, copies, counterfeits and/or colorable imitations of Nike trademarks. Copies of photographs of some of the allegedly counterfeit Nike apparel were attached to the complaint. These photographs depicted the Rabenold t-shirt and

eight other garments that had been purchased in Variety's Allied division. None of the garments in these photographs had Nike neck labels or hang tags.

39. By its terms, the complaint did not limit the allegedly counterfeit Nike apparel to the examples of garments pictured in the photographs. Instead, the complaint stated that "copies of examples of the" alleged counterfeit Nike apparel were attached thereto.

40. Nike and Variety entered into a written agreement settling the Prior Action on February 19, 2001 (the "Settlement Agreement"). The Settlement Agreement defined "Offending Merchandise" as "apparel which Nike alleged [in the complaint in the Prior Action] bore unauthorized reproductions, copies, counterfeits, and/or colorable imitations of the Nike Trademarks." Copies of examples of the Offending Merchandise were attached to the Settlement Agreement.

41. Variety did not acknowledge in the Settlement Agreement that any of the Offending Merchandise was counterfeit.

42. In the Settlement Agreement, each party represented that:

it and its counsel had an adequate opportunity to make whatever investigation or inquiry they may deem necessary or desirable in connection with the subject matter of this Settlement Agreement prior to the execution thereof and the delivery and acceptance of the consideration specified therein.

43. In paragraph 3 of the Settlement Agreement, Variety represented that:

it has made a diligent and good faith inquiry concerning its purchase and sale of the Offending Merchandise and believes, based on that inquiry, that the facts set forth below constitute the best information available to Variety at this time and are materially accurate. . . .

Variety has delivered any and all documents, other than attorney/client communications or attorney work product documents . . . relating, referring or reflecting the purchase, distribution, offer for sale and sale of the Offending Merchandise, including, but not limited to all purchase and sale invoices, sanitized invoices, chain of title documents, packing slips, bills of lading, brochures, advertisements, correspondence and/or notes taken between Variety and [UFI of New York, Inc., Carolina Apparel Trading, Inc., Branco Enterprises, Inc. and Walnut Grove] . . . to Gursky & Ederer, P.C.

44. Nike represented that it did not:

have actual knowledge of the sale by Variety, or the report of any sale by Variety of any other (i) Offending Merchandise; (ii) any other goods bearing unauthorized reproduction, copies, counterfeits and/or colorable imitations of the Nike trademarks; or (iii) in the opinion of Nike or its legal counsel, be identical or confusingly similar to any of the Nike Trademarks, or which alone or in combination with any other indicia, is likely to cause consumers to be confused, mistaken or deceived into believing that the products to which it is affixed originate with, emanate from, or are approved or associated with Nike, other than Variety's Remaining Inventory as set forth in Subparagraph 3(b) above.

45. The Settlement Agreement required Variety to pay, and Variety did pay, $80,000 to Nike.

46. Variety also agreed to cease selling counterfeit Nike goods.

47. The Settlement Agreement required Nike to dismiss the complaint in the Prior Action with prejudice, which Nike did.

48. The Settlement Agreement provided that if Nike should prevail in any action for breach of the Settlement Agreement:

Variety consents to the entry of a permanent injunction enjoining Variety from the sale of goods bearing any unauthorized reproduction, copy, counterfeit or colorable imitation of the Nike Trademarks . . . .

49. The Settlement Agreement further provided that the prevailing party in any suit for its breach "shall recover its costs and reasonable attorneys' fees from the other party."

50. No formal discovery was taken in the Prior Action.

51. At the time the Prior Action was settled, Nike specifically advised Variety that it would not offer Variety any assistance in determining the authenticity of purported Nike goods. Variety had requested that a provision requiring such assistance be made a part of the Settlement Agreement. Nike specifically refused to include such a provision.

52. At the time it entered into the Settlement Agreement, Variety had bought and was continuing to buy purported Nike merchandise bearing the registered Nike trademarks on the secondary market from vendors other than those disclosed in paragraph 3 of the Settlement Agreement. Specifically, Variety had purchased purported Nike merchandise prior to the date of the Settlement Agreement from: Red Tag Apparel, Inc. ("Red Tag");

Jade Apparel, Inc. ("Jade"); STX International, Inc. ("STX"); Carlen Enterprises ("Carlen") and Courtside, Inc. ("Courtside,"). Variety had also purchased purported Nike merchandise prior to the date of the Settlement Agreement from: Admar Trading: Apparel Connection; Ben Elias Industries, Corp.; Great Deals; M & D Sportswear; RDRCI; Rooftop Sales and Wholesale Investment (the "Undisclosed Vendors").

54. None of the vendors mentioned in paragraph 53 was an authorized licensee or distributor of authentic Nike merchandise.

C. **Variety's policy after the Prior Action**

55. After the exchange of letters between Simpson and Blackburn in October 1999, Variety implemented a policy of limiting purchases of all branded goods in general, and Nike goods in particular, to (a) goods with complete labels and hang tags, (b) submitted to and approved by Blackburn.

56. After implementing this policy, Variety bought some apparel items from an authorized Nike retailer to use as a comparison with other items purchased for sale. Variety in fact compared the authorized Nike apparel with other apparel that it purchased.

57. Variety buyers were required to present samples to Blackburn for initial purchases but not for re-orders.

58. At the time that he reviewed purported Nike samples, Blackburn was aware that counterfeit branded goods are sold on the secondary market and that counterfeiters are

capable of making counterfeit labels and hang tags. Blackburn is also aware that high-quality counterfeits exist.

59. Richard Faucher ("Faucher") was employed by Variety as a buyer of apparel from August 1999 until July 2001. Faucher was responsible for sourcing, financial planning, advertising and buying apparel. Faucher had thirty years of training in purchasing branded goods.

60. Faucher was suspicious of every transaction involving a branded product in 2000 and 2001. According to Faucher, Variety's policy was to be careful of the vendor of branded product, "the integrity of it, the authenticity of it, and whether we're allowed to buy it." From early 2000 until 2001, he was required to show Blackburn a sample of every new branded product before he bought it. During this time, Faucher submitted three samples to Blackburn.

61. When he received purported Nike goods for inspection, Blackburn would check to see whether the goods had complete hang tags and neck labels, compare the goods to the authentic Nike garments he had purchased, look at the goods's fabric, graphics and printing quality, and ask the buyer about the price of the goods and the type of vendor.

62. Faucher was aware of two or three occasions on which Blackburn reviewed and rejected samples of Nike goods because Blackburn wasn't comfortable buying them.

63. Variety had a policy of sending a "letter of indemnification" to vendors that a vendor would sign if the vendor legally could sell the product to Variety but would not sign if the product was illegal or was not allowed to be sold to Variety.

64. When buying branded goods, Faucher would provide as much information as he could, and would ask as many questions as he knew to ask, but would allow Variety to decide, legally and "merchandising-wise," whether to buy a particular product. As far as Faucher was concerned, nothing was ever done independently.

65. Variety's buyers have been requested to seek invoices from vendors to show that branded goods emanate from an authorized source. Although Faucher asked his supplier where the purported Nike goods were coming from, the supplier never told him the answer.

66. Carl Anthony Tamborini ("Tamborini") is Variety's divisional merchandise manager. He handles the purchase of all "soft lines," i.e. apparel and accessories, for all Variety stores. Part of his responsibilities include supervising buyers John Brown and Jeff Hamm. Tamborini has been involved with purchasing Nike merchandise since he started working with Variety in 1997.

67. Tamborini was informed by Blackburn that it was a requirement to retain an invoice, either redacted or unredacted, from vendors of branded apparel products, and Tamborini instructed his buyers accordingly. Additionally, when buying any product, Tamborini would look at its price and its "colorations." According to Tamborini, "If someone was selling a $20 item for $3, something is wrong."

68. Although Tamborini's buyers have requested an unredacted invoice for every transaction involving

branded goods, he has never known them to be successful. Seventy-five percent of the time, however, his buyers would receive "sanitized," or redacted, invoices. If Blackburn approved the samples, however, Tamborini and his buyers would go ahead and purchase the branded goods.

69. It is important to Tamborini to know where branded goods come from. He believes that buyers should know the origin of every product purchased.

70. John Brown ("Brown") has been a buyer for Variety for approximately 16 years and is currently a senior buyer in menswear. Brown reports to Tamborini. Brown has been involved in purchasing branded apparel since 2000. His first purchase was made at a Las Vegas closeout show. Prior to this show, Brown was not aware of any Variety policy with respect to the purchase of branded goods. After attending this show, Brown became aware of Variety's policy not to buy branded product on the secondary market unless it possessed intact labels and hang tags, and to submit to Blackburn for inspection samples of products that buyers are considering purchasing. As far as Brown is aware, this policy has been in place since early 2000, but has not been reduced to writing.

71. Jeffrey Hamm ("Hamm") has been a buyer for Variety since April 2000, and has been involved in purchasing branded goods the entire time. Hamm described Variety's policy with respect to branded goods as to look for items with "good standards in quality" and complete labels and hang tags and then to provide the items to Blackburn for review. Hamm is also aware that Variety requires vendors to fill out letters of indemnification. Hamm "would like to see" sanitized invoices for his branded purchases, but he has not had a situation requiring a sanitized invoice because he has been involved only with two branded reorders, not any initial branded purchases. Hamm is aware that hang tags and labels can be counterfeited.

72. Variety did not consider its inability to obtain an "unsanitized" Nike invoice an absolute impediment to the purchase of purported Nike products based on Blackburn's understanding and belief that vendors in the secondary market would not furnish such documentation for fear of being cut out of the chain of sale.[2]

73. Variety has never maintained a written policy for purchasing branded goods in the secondary market.

74. Although Blackburn prepared and gave a talk to approximately twenty-five Variety "hard line" and "soft line" buyers some time in 2001 regarding trademark and counterfeiting issues, neither Faucher, Brown nor Hamm recall attending such a meeting.

75. At the time of their depositions with respect to the instant litigation, neither Tamborini, Brown, Faucher nor Hamm had personal knowledge of the Prior Action.

**D. The Accused Goods**

76. On October 21, 2001, one of Nike's outside counsel purchased

---

**2.** There is no evidence in the record that any vendor refused to produce such documents to Variety because of an expressed concern of being cut out of the chain of sale.

four samples of t-shirts and socks purporting to bear Nike trademarks at one of Variety's stores in Winston–Salem, North Carolina. Nike inspected the t-shirts and socks and determined that they bore counterfeits of Nike trademarks.

77. On or about November 16, 2001, Nike's counsel contacted Blackburn and asserted that Variety had breached the Settlement Agreement.

78. Between November 26, 2001 and February 1, 2002, Variety provided Nike's counsel with seventy-three samples of purported Nike goods being sold by Variety (the "Accused Goods").

79. The Accused Goods were first quality goods which had complete neck labels and hang tags. The cost to Variety of the Accused goods ranged from $2.50 for socks to $9.50 for fleece products. Variety's cost for the Accused t-shirts ranged from $4.25 to $6.45. By comparison, Nzania, an authorized distributor of Nike goods, offered Nike t-shirts for $5.00.

80. Nike subsequently represented to Variety that each of these seventy-three samples was thought by Nike to be counterfeit. Nike did not share with Variety its reasons for determining the Accused Goods to be counterfeit.

81. Variety then removed from sale the stock-keeping unit for each sample, and had all such goods returned to its central distribution centers. Approximately 67,634 items were returned from Variety's stores to the distribution centers. Neither Nike nor Variety has ever examined these items to determine whether they are counterfeit.

82. On August 9, 2002, Nike filed the instant litigation against Variety.

83. At trial, Simpson testified that each of the Accused t-shirts and fleece items[3] was counterfeit for some or all of the following reasons:

**The remainder of this paragraph shall be filed under seal.**

84. At trial, Simpson testified that the Accused socks[4] were counterfeit for some or all of the following reasons:

**The remainder of this paragraph shall be filed under seal.**

85. At trial, Stephen Kirkman, the Vice President of Product Development at Wayne Trademark, Nike's exclusive sock wrapper supplier, testified that many of the Accused socks did not meet Nike's specifications, and thus were counterfeit, for some or all of the following reasons:[5]

**The remainder of this paragraph shall be filed under seal.**

E. **Variety's purchase of the Accused Goods**

87. Variety did not purchase any of the Accused Goods directly from Nike or an authorized Nike licensee.

97. The parties stipulated that Mr. Kirkman would find Exhibits 30, 31, 39–43, 70–76, 81, 88–90, 92, 93, 96 and 98–105 to be inconsistent with Nike specifications for the same reasons.

3. Exhibits 28, 29, 33, 34, 77–79, 82–87, 94–95.

4. Exhibits 30–31, 39–44, 70–76, 80, 81, 88–93, 96–100, 103–105.

5. Mr. Kirkman examined and testified specifically with respect to Exhibits 44, 80, 91 and

88. Variety purchased the Accused Goods from suppliers Jade, STX and Red Tag based on samples displayed in Las Vegas at the MAGIC Show, an annual men's apparel trade show. Ninety percent of the dollar value of the goods was bought from Jade.

89. Variety did not identify Jade, STX or Red Tag in conjunction with the Settlement Agreement in the Prior Action.

90. Nike has been aware of the MAGIC Show for a number of years, but has not sent a Nike representative to inspect the purported Nike goods being sold there.

91. Jade has identified its supplier of the Accused Goods as Pantalones de Calidad ("Pantalones"), which is located in Mexico. Variety was unable to determine any information regarding Pantalones, other than that it was not a manufacturer of Nike goods.

92. Nike makes, or has made for it, apparel products in Mexico, including t-shirts.

93. Nike has never issued a cease and desist letter to Pantalones, Red Tag or Jade.

94. Although Pantalones provided a certificate of authenticity to Jade, Variety was unable to correlate such certificate with any Accused Good that it bought from Jade.

95. Variety is aware that vendor-supplied certificates of authenticity are of very little value in determining whether goods are authentic.

96. Richard Ortiz is the president of Jade.

97. Manny Flores ("Flores") is the Jade sales representative from whom Variety purchased the Accused Goods.

98. Faucher and other Variety buyers met with Flores during every trade show they attended in Las Vegas.

99. Faucher attended at least four closeout shows when he worked for Rose's. There was a Red Tag booth at least once, and there was a Jade booth from then on. Faucher was aware that counterfeiters showed their goods at trade shows.

100. At every show that Faucher attended, Nike branded goods were available, but were not necessarily on display. Faucher could sit down with suppliers that he knew were his contact for Nike products. Flores might or might not have Nike goods on display.

101. The only invoice Variety received with respect to the Accused Goods was a redacted invoice from STX. Blackburn found this redacted invoice not to be helpful in determining whether the goods in question were authentic.

102. Variety requested Nike invoices from Jade, but never received any.

103. Tamborini first became aware of Red Tag at the February 2000 MAGIC Show. He and other Variety buyers and employees, including Faucher, visited with Flores at a Red Tag booth displaying a large number of Nike t-shirts. This was Faucher's first involvement in the purchase of branded apparel for Variety. Flores said that he would sign a letter of indemnification and provide Variety with samples of the Nike product. Tamborini and the other Variety employees told Flores they were interested in purchasing 12,000 to 18,000 t-shirts, but Flores did not have that kind of quantity available. Flores agreed to send

Variety samples of the t-shirts that he could sell, and the Variety employees told him that they had to confirm the authenticity of the product and would get back to him. Flores said that the Nike goods were excess goods which would be coming from a factory in Mexico.

104. After the February 2000 MAGIC Show, Flores signed a letter of indemnification and sent samples to Variety, which were provided to Blackburn for review. After Blackburn had reviewed the samples, Variety ordered some of the Accused Goods from Red Tag. Faucher placed part of this order. Every time that Faucher purchased Accused Goods from Flores, he asked Flores whether the goods were "okay" or "intact," whether they had complete labels, and whether it was legal for Variety to buy them. To all of these questions, Flores answered yes.

105. Faucher also asked specifically where Flores got the Accused Goods, but Flores refused to answer.

106. Brown placed a different part of the order, which Tamborini approved. Because Blackburn already had approved the Red Tag samples, Tamborini understood that Variety could now buy any t-shirts, long or short sleeve, from Red Tag.

107. Because other persons at Variety previously had spoken with Flores about the goods, Brown did not inquire of anyone at Red Tag where Red Tag got the Accused Goods and did not request any documentation which might have assisted him in determining the origin of the Accused Goods.

108. As far as Tamborini is aware, the company that was Tag the Apparel Group became Red Tag and then became Jade. Tamborini, however, was not certain about this. Faucher understood that Flores originally worked for Red Tag, and then tried to branch off on his own as Jade. Faucher met Flores first at a Red Tag booth and later at a Jade booth. Faucher did not know whether Tag the Apparel Group was affiliated either with Red Tag or with Jade. Faucher's only contact with respect to the Accused Goods was Flores.

109. Hamm was involved in two reorders of Accused Goods from Red Tag. Hamm first met Flores at the 2001 MAGIC Show. Hamm was aware that other Variety personnel had been in contact with Flores. Hamm knew that Red Tag did not manufacture the Accused Goods and that the Accused Goods had been approved by Variety as being legitimate. Hamm believed that Jade and Red Tag were one and the same. The only person Hamm dealt with at Jade was Flores. Hamm did not ask Red Tag where the Accused Goods originated because they had already been approved and were "to the best of standards." Similarly, Hamm did not ask Red Tag for any documentation on the Accused Goods' origin.

110. At his deposition for this case, Ortiz invoked the Fifth Amendment privilege when: questioned as to the companies from which Jade purchased the Accused Goods; asked whether he made any inquiries regarding the authenticity of the Accused Goods before purchasing them; asked whether he made any representations to Variety regarding the authenticity of the Accused Goods or provided any documents to Variety to verify the authenticity

of the Accused Goods; asked whether Flores is associated with Jade; and questioned about a business relationship between Jade and Red Tag.

111. At his deposition for this case, Flores testified that he has operated Red Tag for three years, prior to which he worked for The Apparel Group, which is no longer in business. Flores testified that he never worked "for" Jade and invoked the Fifth Amendment when asked if he ever worked "with" Jade. Flores testified that Carlen is a broker located in Los Angeles that used to do business with The Apparel Group. Carlen's name appeared on certain Variety purchase orders along with Red Tag's name. Flores knew Carlen and could get in touch with Carlen in case of a problem. According to Flores, there was no relationship between Carlen and Red Tag.

112. Flores invoked the Fifth Amendment when: asked whether Red Tag ever did business with Variety or ever purchased goods directly from a manufacturer; asked to identify his source for the Accused Goods; asked to explain Red Tag's procedure for purchasing goods; asked what inquiries he makes as to product authenticity before making a purchase; asked whether he knows how to determine whether a product is genuine or counterfeit; questioned with respect to his presence at the MAGIC Show or contact with Variety at such show; asked why he was listed as the sales representative on a Jade invoice; asked whether he ever acted as a representative for Jade's inventory or had samples of Jade's inventory of Nike product at the February 2000 Magic Show; asked about his interaction with Variety's personnel at or after that show; and asked whether he had any reason to believe that the Accused Goods that he sold were not genuine.

### F. Variety's costs and profits [6]

113. Variety's total gross income from its sales of the Accused Goods is $3,525,096.00.

114. The total cost of Accused Goods sold by Variety is $2,174,704.

115. Variety's gross income for the Accused Goods ($3,525,096) minus its cost for the Accused Goods it sold ($2,174,704), is $1,350,392.

116. Brant Sprunger, Variety's controller ("Sprunger"), testified that Variety incurred the following types of expenses in connection with its sale of the Accused Goods: payroll; rent; utilities; trash; repairs; depreciation; taxes and business licenses; warehouse and distribution; managerial personnel; merchandising; data processing; accounting and finance; security personnel; insurance; and benefits. Sprunger, however, could not determine from Variety's general ledger what percentage of the company's overall expenses for such items were directly attributable to Variety's sale of the Accused Goods.

117. Variety's total gross income from the sale of the Offending Merchandise in the Prior Action is $122,880.

---

**6.** The cost, sales and profit numbers referenced in paragraphs 113–115 are taken from Ex. 143. The cost, sales and profit numbers referenced in paragraphs 117–119 are taken from Ex. 121.

118. Variety's total cost of the Offending Merchandise that it sold was $60,103.88.[7]

129. Variety's gross income for the Offending Merchandise ($122,880) minus its cost for the Offending Merchandise it sold ($60,103.88), is $62,776.12.

### G. Variety's litigation with Jade

120. After Nike accused the Accused Goods of being counterfeit, Variety stopped payment to Jade for these goods. Jade then sued Variety in state court in Texas to recover payment. Variety removed the case to federal court, and filed a counterclaim against Jade to the effect that, if the goods were counterfeit, then Variety was not obligated to pay for them.

121. The Texas case has been voluntarily dismissed with leave to refile awaiting the resolution of the instant litigation.

## II. Conclusions of Law

### A. Variety sold and offered for sale counterfeit Nike products.

■ The Lanham Act imposes liability for trademark counterfeiting on any person who shall "use in commerce ... any counterfeit ... of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ...." 15 U.S.C. § 1114(1)(a). A counterfeit mark is defined as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C.

§ 1127. The Court finds as a matter of law that the Accused Goods and Offending Merchandise are counterfeit Nike products. The Accused Goods and Offending Merchandise bear marks identical to or substantially indistinguishable from registered Nike trademarks, yet these goods do not meet with Nike specifications.

The Offending Merchandise is counterfeit because it contains:

**The remainder of this paragraph shall be filed under seal.**

Nike has presented no evidence which would allow the Court to conclude that the goods Variety purchased from Undisclosed Vendors prior to the entry of the Settlement Agreement are counterfeit. The Court declines Nike's invitation to "infer" that such goods were counterfeit. *See* Doc. 94 at 17.

### B. Preclusive effect of Prior Action

■ Variety argues that the dismissal of the Prior Action with prejudice precludes Nike from bringing any claims herein based on the counterfeit nature of the Offending Merchandise. The Court agrees. As the Eleventh Circuit has held:

Under res judicata, also known as claim preclusion, a final judgment on the merits bars the parties to a prior action from re-litigating a cause of action that was or could have been raised in that action. *See, e.g., Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). Res judicata may be properly applied only if certain prerequisites are met. In the Eleventh Circuit, a party seeking to invoke the doctrine must establish its propriety by satisfying four initial elements: (1) the

---

**7.** Variety sold only 5,881 of the 6,012 items that it purchased from Branco Enterprises. *See* Ex. 121. Variety's cost for the 6,012 items was $29,110.95. *Id.* Accordingly, Variety's cost per Branco item was $29,110.95 divided by 6,012, or $4.84. Variety's cost for the 5,881 Branco items that it actually sold was thus 5,881 multiplied by $4.84, or $28,476.63.

prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action. *See Israel Discount Bank Ltd. v. Entin,* 951 F.2d 311, 314 (11th Cir.1992); *In re Justice Oaks II, Ltd.,* 898 F.2d 1544, 1550 (11th Cir.1990). The court next determines whether the claim in the new suit was or could have been raised in the prior action; if the answer is yes, res judicata applies.

*In re: Piper Aircraft Corp.,* 244 F.3d 1289, 1296 (11th Cir.2001). All four elements are met. There is no question that this Court is a court of competent jurisdiction, that the Prior Action involved the same parties, and that the Prior Action involved Nike's same claims with respect to Variety's sale of the Offending Merchandise. Additionally, Nike cannot question the fact that this Court's dismissal of the Prior Action with prejudice served as a final judgment on the merits. *See Hunt v. Hawthorne Assoc.,* 119 F.3d 888, 911 n. 63 (11th Cir.1997) ("[A] stipulation of dismissal with prejudice ... at any stage of a judicial proceeding, normally constitutes a final judgment on the merits which bars a later suit on the same cause of action.") (citation omitted). Accordingly, res judicata applies to bar Nike from reviving its claims that Variety violated the Nike trademarks by selling and offering for sale the Offending Merchandise.

Variety also argues that the dismissal with prejudice of the Prior Action serves to bar any recovery by Nike of Variety's profits on the purported Nike goods that Variety purchased from the Undisclosed Vendors. As discussed above, there is no evidence on the present record from which the Court could conclude that such goods were counterfeit. Accordingly, the Court makes no determination of Variety's prof-

its with respect to such goods and therefore does not reach this question.

## C. Trademark Counterfeiting

### 1. Liability

■ "The Lanham Act prohibits, among other things, the use in commerce of a counterfeit trademark in a manner likely to cause confusion; and the Act further provides that anyone using a counterfeit trademark in such manner shall be liable in a civil action to the registrant of the trademark." *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1475 (11th Cir.1991) (citing 15 U.S.C.A. § 1114(1)(a)). Based on its conclusion that Variety sold and offered for sale goods bearing counterfeit Nike trademarks, the Court finds that Variety is liable for trademark counterfeiting pursuant to the Lanham Act. Variety's use of marks identical or substantially identical to the registered Nike trademarks was likely to cause confusion in the minds of potential buyers as to the source, affiliation or sponsorship of the Accused Goods. *See Babbit Elecs., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1178 (11th Cir.1994).

In determining whether there is a likelihood of confusion, the Court may consider "a variety of factors, including similarity of design, similarity of the products, identity of retail outlets and purchasers, similarity of advertising media, the defendant's intent and actual confusion." *Id.* (citation omitted). Application of these elements to the facts of this case compels the conclusion that Variety's sale of the Accused Goods is likely to confuse the public into believing that such goods are associated with Nike or that Nike sponsored, licensed or consented to the sale of such goods. *Id.* at 1179. The marks on the Accused Goods are identical or substantially identical to the Nike trademarks. The Accused Goods are "first quality" goods sold alongside

other branded apparel products. They were sold in the type of retail outlets where customers expect to find branded sporting apparel, thus making them more likely to cause confusion and mistake, and to deceive the consuming public into believing that they were purchasing authentic Nike apparel. It is impossible for someone with an untrained eye to discern that the Accused Goods are not genuine Nike products. Indeed, even Nike's director of security made his determinations that the Accused Goods were counterfeit not by examining the garments themselves, but rather by examining the subtleties of their wrappers, hang tags and neck labels. Finally, the types of goods at issue, sporting apparel, are minor purchases that may be categorized as "impulse" purchases. *Polo Fashions, Inc. v. Rabanne*, 661 F.Supp. 89, 95 (S.D.Fla.1986). Consumers do not scrutinize shirts, fleece and socks carefully to discern the differences between the symbols displayed on the garments, *id.*, let alone their wrappers, labels and hang tags.

■ A showing of intent or bad faith is unnecessary to establish trademark counterfeiting in violation of § 1114. *Chanel*, 931 F.2d 1472, 1476. In other words, since the Accused Goods sold by Variety were counterfeit, Variety is plainly liable to Nike for Nike's claim of trademark counterfeiting under § 1114. *Id.* at 1475.

**2. No willful blindness**

Section 1117(a) of the Lanham Act entitles a plaintiff who prevails on a trademark counterfeiting claim to "recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Because Nike prevails on its trademark counterfeiting claim, it is entitled to recover its costs, any damages it sustained, and the costs of this action. Nike, however, seeks to recover three times Variety's profits as well as

attorneys' fees on the grounds that Variety was willfully blind in selling and offering for sale counterfeit Nike products. The Lanham Act provides for such treble damages when a defendant intentionally uses "a mark or designation, knowing such mark or designation is a counterfeit mark ... in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C.A. § 1117(b). Accordingly, in order for Nike to recover treble damages on its counterfeiting claim, it must demonstrate not only that Variety infringed a registered trademark in violation of 15 U.S.C. § 1114(1)(a), but also that Variety "intentionally used a mark, knowing such mark is a counterfeit mark." *Babbit*, 38 F.3d 1161, 1181 (citing 15 U.S.C. § 1117(b)).

■ In the Eleventh Circuit, "willful blindness" is sufficient to satisfy § 1117(b)'s intent requirement. *Chanel*, 931 F.2d 1472, 1476. Whether a defendant has been willfully blind, however, will depend on the circumstances. *Id.* To assess whether Variety has been willfully blind, the Court must determine what Variety knew. *Id.* at 1476–77. Under the doctrine of willful blindness, "knowledge can be imputed to a party who knows of a high probability of illegal conduct and purposefully contrives to avoid learning of it." *Williams v. Obstfeld*, 314 F.3d 1270, 1271 (11th Cir.2002); *see also Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir.1992) (to be willfully blind, person "must suspect wrongdoing and deliberately fail to investigate"); *Louis Vuitton, S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir.1989) (finding willful blindness when defendant failed to inquire further out of fear of the result of his inquiry); *Monsanto Co. v. Campuzano*, 206 F.Supp.2d 1271, 1275 (S.D.Fla.2002) (willful blindness occurs when person sus-

**1370**

pects unlawful activity and deliberately fails to act).

■ Willful blindness requires more than mere negligence or mistake. *Splunge v. Shoney's, Inc.,* 97 F.3d 488, 491 (11th Cir.1996); *Hard Rock,* 955 F.2d at 1151; *see also United States v. Adair,* 951 F.2d 316, 319 n. 6 (11th Cir.1992) ("A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge."); *A Touch of Class Jewelry v. J.C. Penney Co., Inc.,* 2000 WL 1224804 (E.D.La. Aug.28, 2000) (gross negligence is not sufficient to support a finding of willful blindness). A negligence standard is an objective one which asks whether a reasonably prudent person in defendant's shoes would have known that the items were counterfeit. *Hard Rock,* 955 F.2d at 1151. By contrast, the willful blindness standard is a subjective one which asks what the defendant suspected, and what he did with such suspicion. *Id.*

■ The Court finds as a matter of law that Variety was clearly, perhaps even grossly, negligent in failing to suspect that the Accused Goods might be counterfeit. A reasonably prudent company with 450 stores and nearly $600 million in annual gross revenue, which had been sued several times for trademark counterfeiting and infringement, had knowledge that labels and hangtags could be counterfeited, and was aware that counterfeit goods were available on secondary markets would have suspected that the Nike goods it purchased might be counterfeit. Moreover, a reasonably prudent company would not have entrusted an attorney who admittedly spent most of his time on "slip and fall" cases and who had minimal experience in trademark matters as the final arbiter of whether branded goods were authentic. Finally, a reasonably prudent company would not have expected Nike to inform it of whether particular Nike products were genuine after Nike specifically had refused to accept such a responsibility.

Having considered the live testimony of Blackburn, a credible witness, and the deposition testimony of other Variety personnel, however, the Court concludes that Variety did not know of a high probability of illegal conduct and purposefully contrive to avoid learning of it. Additionally, the Court concludes that Variety did not fail to inquire further out of fear of the result of its inquiry. Accordingly, Variety was not willfully blind and treble damages are not available to Nike. It is beyond dispute that Variety did not obtain unsanitized invoices for every purchase of a purported Nike product. According to Nike, this fact must compel a finding of willful blindness. Yet Nike ignores the fact that Variety failed to insist on unsanitized invoices not out of a fear that such invoices would expose purported Nike products as counterfeit, but rather out of an honestly held belief that such insistence would be futile. However objectively unreasonable, Variety honestly believed that vendors refused to provide such invoices not to hide the fact that they were selling counterfeit products, but rather to preserve their own role as middlemen between manufacturers and Variety by refusing to identify any intermediate suppliers.

Moreover, Variety's buyers did make inquiries with respect to the source of purported Nike products, at least the first time they purchased purported Nike goods from a particular vendor. Variety's buyers did inquire as to whether the Nike goods they were buying were authentic, and requested assurances regarding such authenticity. Believing any invoices provided by vendors to be of little or no value, Variety instead required written letters of indemnification in which vendors attested to the authenticity of their product.

Once Blackburn understood from his conversation with Simpson that all authentic Nike products came with complete, uncut hang tags and neck labels, Variety never again purchased Nike products without such hang tags and neck labels. *Compare Chanel*, 931 F.2d 1472, 1476 (noting that defendant knew that Chanel goods were accompanied by indicia of authenticity and nevertheless purchased purported Chanel goods which lacked all such indicia). Variety bought genuine Nike goods and compared samples of all prospective purchases of Nike product to such genuine goods. Variety bought first quality goods which were not visibly inferior to genuine Nike products. *Compare Levi Strauss & Co. v. Diaz*, 778 F.Supp. 1206, 1208 (S.D.Fla.1991) (finding willful blindness when defendant bought goods "not of the type or quality normally produced by Levi Strauss."). Variety checked to make sure that the fabric, graphics and printing quality were all of the highest standard. Variety made sure that the goods were priced appropriately for branded goods, and Variety bought the purported Nike goods from vendors at a nationwide trade show. *Compare Vuitton*, 875 F.2d at 590 (finding willful blindness when defendant bought obviously poorly crafted goods from an intinerant peddler at bargain-basement prices).

Variety's past experiences with trademark infringement made its evidence of attempted verification of authenticity more believable. *See Chanel*, 931 F.2d 1472, 1477. The Court credits Blackburn's testimony that if Nike had shared with Variety its criteria with respect to genuine hang tags, neck labels and sock wrappers, Variety would have incorporated such verifying criteria into its own authentication process. Quite simply, Variety consciously took

many steps to ensure that the Nike products that it bought were genuine. While Variety ultimately failed in this endeavor, such failure was caused by negligence, perhaps gross negligence, but not by willful blindness.

### D. Trademark Infringement, Common Law Trademark Infringement, Unfair Competition and False Designation of Origin

■ Variety is liable to Nike for trademark infringement under the Lanham Act, unfair competition and false designation of origin because the likelihood of confusion required for trademark counterfeiting under § 1114 is the prevailing legal standard applicable to such claims. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258, 265 (5th Cir.1980) [8]; *see also Chanel*, 931 F.2d at 1475 n. 3 ("[T]he same facts support a cause of action for unfair competition as for trademark infringement."). Variety is liable to Nike for common law trade infringement for the same reason. *See Bd. Regents Univ. Sys. Ga. v. Buzas Baseball, Inc.*, 176 F.Supp.2d 1338, 1350–51(N.D.Ga.2001) (citing *Ackerman Sec. Sys., Inc. v. Design Sec. Sys.*, 201 Ga.App. 805, 412 S.E.2d 588 (Ga.App. 1991)).

### E. Breach of Contract

■ Variety is liable to Nike for breach of contract for having violated the Settlement Agreement by continuing to sell and offer for sale counterfeit Nike products after the Settlement Agreement was entered. *See* Ex. 121 at ¶ 2. Accordingly, pursuant to the terms of the Settlement Agreement, Nike is entitled to recover its costs and reasonable attorneys' fees that it has incurred in conjunction with the

---

**8.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding prece- dent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

instant action, and to the entry of a permanent injunction enjoining Variety from the sale of goods bearing any unauthorized reproduction, copy, counterfeit or colorable imitation of the Nike Trademarks. *See* Ex. 121 at ¶ 13.

### F. Trademark Dilution

The Lanham Act provides that the "owner of a famous mark shall be entitled ... to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). The elements of a dilution claim are that: (1) the plaintiff is the owner of a mark which qualifies as a "famous" mark; (2) the defendant is making commercial use; (3) in interstate commerce; (4) of a mark or trade name; (5) defendant's use began after the plaintiff's mark became famous; and (6) defendant's use causes dilution by lessening the capacity of plaintiff's mark to identify and distinguish goods or services. *Voice–Tel Enter., Inc. v. JOBA, Inc.*, 258 F.Supp.2d 1353, 1362 (N.D.Ga.2003); *Portionpac Chem. Corp. v. Sanitech Sys., Inc.*, 217 F.Supp.2d 1238, 1250–51 (S.D.Fla. 2002). A showing of actual dilution, rather than a likelihood of dilution, is required. *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 123 S.Ct. 1115, 1124, 155 L.Ed.2d 1 (2003).

The Court has no difficulty in concluding that the Nike trademarks qualify as famous marks in light of the following factors: (1) the inherent distinctiveness of the marks; (2) the length of use of the marks (*see* ¶ 7, supra); (3) the extensive advertising on a worldwide basis; (4) the global presence of Nike apparel and products; (5) the lack of evidence of any third party use; and (6) the existence of federal trademark registrations for the marks. *See* 15 U.S.C. § 1125(c). The

Court further concludes that Variety made commercial use of the Nike trademarks in interstate commerce after the Nike trademarks had become famous. Finally, the Court concludes that Variety has diluted the Nike trademarks due to the identical or virtually identical character of the marks on the Accused Goods to the Nike trademarks. *See Moseley*, 123 S.Ct. at 1125 (it may not be necessary to present direct evidence of dilution "if actual dilution can reliably be proven through circumstantial evidence-the obvious case is one where the junior and senior marks are identical."); *see also Pinehurst, Inc. v. Wick*, 256 F.Supp.2d 424, 431 (M.D.N.C. 2003) (finding actual dilution where defendant used plaintiff's marks in its domain name because a customer using the internet "will be unable to discern any appreciable difference" between the defendant's domain name and the plaintiff's mark). Accordingly, Variety has diluted the Nike trademarks and Nike is entitled to an injunction, which is set forth in Section III(B) below.

## III. Remedies

### A. Damages

#### 1. Variety's profits

Pursuant to § 1117(a) of the Lanham Act, "in assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." Accordingly, the plaintiff need show only the defendant's gross sales. *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 586 (5th Cir.1980). Thereafter, the burden shifts to the defendant to demonstrate that the plaintiff's sales calculations are fallacious. *Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir.1985). The defendant also bears the burden of proving any costs that should be deducted from the gross revenue of the sales of the goods.

*Maltina,* 613 F.2d at 586. In this Circuit, such costs may be deducted only when they are "actually related" to the sale of the infringing product. *Id.*

In the instant litigation, Nike has submitted documents, created by Variety, evidencing total sales of the Accused Goods (Ex. 143). These documents specifically accounts for Accused Goods which were sold and then returned, as well as any other Accused Goods which remain on hand at Variety. Based on the documents created by Variety and relied upon by Nike (Ex. 143), the Court finds that 393,-502 pieces of Accused Goods were sold by Variety-and were not returned to Variety-for a total sales revenue of $3,525,096. Variety paid $2,174,704 for these 393,502 garments. Accordingly, Variety's net profit on the Accused Goods was $1,350,392.

■ Variety asks the Court to deduct various costs and expenses from its net profit on the Accused Goods. First, Variety asks the Court to deduct Corporate Overhead and Occupancy Costs-which the Court considers to be part of overhead. *See* Ex. ZZ. The Court declines to deduct these costs on the grounds that it appears that Variety would have incurred these costs even without selling the Accused Goods. *See Abbott Labs. v. Unlimited Beverages, Inc.,* 218 F.3d 1238, 1242 (11th Cir.2000) (finding no abuse of discretion in district court's refusal to deduct costs that "would have been incurred even without the sale of the prohibited product"). Moreover, "a proportionate share of overhead is not deductible when the sales of an infringing product constitute only a small percentage of total sales." *Maltina,* 613 F.2d at 586. Here, the revenue derived from the Accused Goods, roughly $3.5 million, constitutes only a small percentage of Variety's total sales, roughly $590 million. Accordingly, Variety's Occupancy Costs and Corporate Overhead shall not be de-

ducted from its net profits on the Accused Goods.

■ Variety also asks the Court to deduct Payroll Costs, Advertising Expenses and Operating Expenses from its net profits on the Accused Goods. *See* Ex. ZZ. Again, the Court declines to make such deduction. First, the Court declines to award Variety a deduction for its advertising expenses on the grounds that no evidence was presented that Variety specifically advertised the Accused Goods. Sprunger, the only witness questioned with respect to advertising expenses, testified that he did not know whether Variety ever advertised any of the Accused Goods, or whether Variety advertised any branded goods at all. Next, the Court declines to deduct payroll costs on the grounds that Variety offered no evidence of which payroll costs pertained to the sale of the Accused Goods. Sprunger testified that he could not say whether any of Variety's payroll costs assisted in the sale of the Accused Goods and that he did not know whether Variety hired any additional personnel to accommodate the sale of the accused goods. Finally, the Court declines to deduct operating expenses for the same reason. Sprunger testified that he did not know whether any of the operating expenses identified by Variety actually assisted in the sale of the Accused Goods, and that he could not point out on Variety's general ledger an operating expense that pertained to any particular item. The Court finds that Variety has failed to meet its burden, required by § 1117(a), of proving the costs that it contends should be deducted from its profits on the Accused Goods.

Having rejected Variety's proposed deductions, the Court concludes that Variety is liable to Nike for $1,350,392 in profits for the Accused Goods.

## 2. Statutory damages

■ As an alternative form of relief, Nike asks the Court to award it statutory damages pursuant to 15 U.S.C. § 1117(c). Section 1117(c) provides:

> In a case involving the use of a counterfeit mark ... in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits ..., an award of statutory damages ... in the amount of—
>
> (1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or
>
> (2) if the court finds that the use of the counterfeit mark was willful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c). The option of statutory damages serves as an alternative to traditional awards based on actual losses under subsections 1117(a) and (b). *See Sara Lee Corp. v. Bags of N.Y., Inc.*, 36 F.Supp.2d 161, 165 (S.D.N.Y.1999).

The Court finds that Nike is entitled to $900,000 in statutory damages. This represents $100,000 for Variety's use of: (1) NIKE on socks; (2) NIKE on shirts; (3) NIKE/SWOOSH DESIGN on shirts; (4) NIKE/SWOOSH DESIGN on sweatpants; (5) SWOOSH DESIGN on sweatpants; (6) SWOOSH DESIGN on sweatshirts; (7) SWOOSH DESIGN on socks; (8) SWOOSH DESIGN on shirts; and (9) NIKE/SWOOSH/AIR DESIGN on shirts. Nike will have ten (10) days from the date of this Order to elect the award of statutory damages under § 1117(c) or the award of profits under § 1117(a). If no election is made, the Court will enter judgment for the profits assessed under § 1117(a).

## B. Permanent Injunction

Variety, its representatives, agents, servants, employees, affiliates, divisions and subsidiaries, and all others in direct or indirect concert or participation with Variety, shall hereby be PERMANENTLY ENJOINED AND RESTRAINED from:

(1) selling, offering for sale, advertising, promoting, marketing and distributing the Offending Merchandise and Accused Goods; and

(2) importing, exporting, distributing, circulating, selling, offering for sale, advertising, promoting or displaying any unauthorized reproduction, counterfeit, copy or colorable imitation of any of the Nike trademarks, or any marks confusingly similar thereto, either individually or in conjunction with other words, marks or designs.

## C. Attorneys' fees and costs

Because Variety is not the prevailing party in this action, the Court hereby DENIES Variety's motion for attorneys' fees as prevailing party (Doc. 76).

Nike, however, is entitled to reasonable attorneys' fees pursuant to the Settlement Agreement. Additionally, pursuant to § 1117(a), Nike is entitled to recover its costs associated with this action. Within fifteen (15) days of the date of this Order, Nike SHALL submit to the Court a detailed summary of the costs and **reasonable** attorneys' fees it has incurred in conjunction with this action. Variety may file a reply within seven (7) days of Nike's submission. Thereafter, the Court shall schedule a hearing, if necessary, to determine the extent of Nike's reasonable attorneys' fees.

■ The Court specifically declines to award Nike its attorneys' fees pursuant

to the Lanham Act, which authorizes an award of fees only in "exceptional cases." 15 U.S.C. § 1117(a). An exceptional case is one in which "the infringing party acts in a 'malicious,' 'fraudulent,' 'deliberate,' or 'willful' manner." *Burger King Corp. v. Pilgrim's Pride Corp.*, 15 F.3d 166, 168 (11th Cir.1994). As discussed above, Variety's actions, though clearly negligent, do not meet such requirements.

### *CONCLUSION*

For the foregoing reasons, the Court hereby: DENIES the parties' motions for summary judgment (Docs. 60, 65); DENIES the parties' motions in limine (Docs. 83, 92); DENIES as MOOT Nike's motion for an assignment of trial (Doc. 98); and DENIES Variety's motion for attorneys' fees (Doc. 76). The Court, however, GRANTS Variety's motion for leave to submit proposed post-trial findings of fact and conclusions of law (Doc. 128). The Court finds for Nike on its trademark counterfeiting, trademark infringement, false designation of origin, unfair competition, trademark dilution and breach of contract claims. The Court awards Nike a total of $1,350,392, representing Variety's profits on the Accused Goods. Alternatively, Nike is entitled to $900,000 in statutory damages. The Court permanently enjoins Variety from using counterfeit Nike products as set forth in Section (III)(B) above. The Court ORDERS Nike to submit a detailed summary of its reasonable attorneys' fees within fifteen (15) days of the date of this Order and ORDERS Variety to file a reply, if any, within seven (7) days thereof. After considering such submissions and holding a hearing if necessary, the Court SHALL award reasonable attorneys' fees to Nike.

So ORDERED.